<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **H20 PLUS, LLC,** | **Civil Action No. 10-3089 (WJM)** |
| **Plaintiff**, | |
| **v.** | |
| **ARCH PERSONAL CARE PRODUCTS, L.P. AND ARCH CHEMICALS, INC.,** | <u>**OPINION**</u> |
| **Defendants.** | |

<u>F</u>ALK, U.S.M.J.

Plaintiff, H20 Plus, has filed a motion to disqualify the law firm of Kelley Drye & Warren, LLC ("KDW") as counsel for Defendants, Arch Personal Care Products, L.P. and Arch Chemicals, Inc. (collectively, "Defendants" or "Arch"), because KDW previously represented H20 Plus in the sale of its business in 2008 and allegedly had access to the company's most confidential and sensitive information. Defendants have opposed the motion. The issue to be decided is whether KDW's current representation of Arch is "substantially related" to its previous representation of H20 Plus such that it is precluded by New Jersey Rule of Professional Conduct ("RPC") 1.9 and the New Jersey Supreme Court's controlling opinion in <u>City of Atlantic City v. Trupos</u>, 201 N.J. 447 (2010). The Court has considered the papers submitted and heard oral argument on November 15, 2010. For the reasons set forth below, Plaintiff's motion is **granted** and KDW is disqualified.

## BACKGROUND

### A.    This Lawsuit

On June 17, 2010, H20 Plus commenced this breach of contract and fraud action against Defendants Arch Personal Care Products, L.P. and Arch Chemicals, Inc.  H20 Plus manufactures and markets sea-derived, all-natural skin care products.  (Compl. ¶ 4.)  Arch is a global biocides company that creates chemical solutions to control and destroy harmful microbes in various products.  (Compl. ¶ 5.)

In 2007, H20 Plus began to develop a new brand titled Sea Pure, which was 100% natural, vegan, and biodegradable.  (Compl. ¶ 10.)  To ensure that the products remained 100% natural, H20 sought out an all-natural cosmetic preservative that would suppress naturally occurring contaminants such as mold.  (Id.)  At that time, Arch marketed an all-natural chemical preservative called Biovert. (Compl. ¶¶ 14-17.)  Based on Arch's marketing efforts, as well as a pre-existing relationship between H20 Plus and Arch relating to other products, H20 Plus decided to use Biovert in its new brand, Sea Pure, and executed four separate purchase orders from Arch for the raw material. (Compl. ¶¶ 24-25.)  Upon receipt, H20 was responsible for formulating and manufacturing Sea Pure by integrating Arch's Biovert compound into their Sea Pure mixture pursuant to directions provided by Arch.  (Compl. ¶ 43.)

After distributing Sea Pure products for a few months, H20 Plus began to receive complaints from its customers that mold had developed in the products.  (Compl. ¶¶ 2, 50.)  H20 sought Arch's assistance in determining why Biovert had failed to preserve the Sea Pure product and prevent the growth of mold.  (Compl. ¶ 52.)  Thereafter, both an independent mycologist and Arch's own testing confirmed heavy mold growth in Sea Pure products containing Biovert.  (Compl. ¶¶ 50-53.)  It is alleged that Arch conceded that its own test results showed Biovert alone was insufficient in

controlling the growth of mold.  (Compl. ¶ 56.)  As a result, H20 Plus was forced to recall all Biovert-preserved products, amounting to almost 150,000 units.  (Compl. ¶¶ 57-58.)

On March 22, 2010, counsel for H20 sought payment from Arch for costs incurred as a result of the recall, requesting $1.9 million to resolve the dispute, but reserving the right to file suit for more than $10 million should the need arise.  This request was denied, and thereafter, Arch allegedly breached an open sales order placed by H20 relating to another product and refused to sell H20 any further raw materials.

On June 17, 2010, H20 filed a seven count complaint in this Court, alleging: (1) breach of contract; (2) breach of express warranty; (3) breach of implied warranty of merchantability; (4) breach of implied warranty of fitness for a particular purpose; (5) fraud; (6) negligent misrepresentation; (7) violation of the New Jersey Consumer Fraud Act; and (8) breach of contract and repudiation (relating to the open purchase order for non-Biovert related raw materials).

**B.**    **Pre-suit Demands and Correspondence**

Following the failure of Sea Pure, which occurred allegedly as a result of the ineffectiveness of Arch's Biovert compound, H20 Plus sent a demand letter to Arch.  Arch responded by a letter sent by KDW.  This series of communications led to the issue of disqualification that is now before the Court.

**1.**    **H20 Plus's Demand Letter**

On March 22, 2010, H20 Plus sent a letter to the Chief Legal Officer of Arch, Sarah A. O'Connor, Esq., regarding the damages H20 had incurred following the recall of the Sea Pure products.  (Certification of Daniel F. Mulvihill, Esq. ("Mulvihill Cert."), Ex. A.)  H20 Plus wrote that its investigations had shown that Arch was aware of Biovert's flaws prior to making representations

3

to H20 Plus about its effectiveness.  H20 Plus made a settlement demand of $1.9 million.  If rejected, H20 Plus threatened to file a complaint seeking the full quantum of damages, in excess of $10 million.  (Id.)

### 2.     Arch Retains the Law Firm of Kelley Drye & Warren LLP

As a result of H20 Plus's Demand Letter, Arch contacted Joseph A. Boyle, Esq., its long-time attorney from the New Jersey office of Kelley Drye & Warren LLP.  (Declaration of Joseph A. Boyle, Esq. ("Boyle Decl.") ¶ 5.)  KDW has represented Arch for eleven years in a number of litigation matters in New Jersey and has otherwise provided general legal advice.  (Boyle Decl. ¶ 3.)

### 3.     KDW Drafts Arch's Response to H20 Plus's Demand Letter

On May 5, 2010, Arch responded to H20 Plus's letter by rejecting H20 Plus's settlement demand and asserting allegations of their own.  (Mulvihill Cert., Ex. B.)  Arch denied responsibility for any Biovert failure and stated the following:

> Numerous variables, beyond the control of the raw material provider, but almost always under the control of the manufacturer, impact the efficaciousness of a preservation system.  Those factors include, but are not limited to, the: pH of the final product; mixing of the final product; other attributes of the final product; storage of the final product; packaging of the final product; shipment of the final product; the sterility of the water and other ingredients used by the manufacturer; and hygiene of the plant where the final product is mixed and packaged.  **This final factor appears particularly important in this matter.  We understand that H20 Plus was previously subject to a voluntary recall due to mold issues that emanated from the plant or plants where its Sea Pure Products line was manufactured.  Again, based on our understanding, the Food & Drug Administration ("FDA") audited the H20 Plus facility and made certain findings.  It is not wild speculation to conclude that the problems that caused the previous voluntary recall contributed to, if not solely caused, the most recent recall of**

4

**the Sea Pure Products**.

(Id. at 1-2) (emphases added).

### 4.   **KDW's previous representation of H20**

KDW had previously represented H20 in the sale of its business in 2008.  In the course of that representation, KDW allegedly had access to and reviewed thousands of H20's confidential documents, including confidential documents relating to operating procedures of H20's manufacturing facilities, FDA audits related to mold issues, and a prior mold-related recall.  Arch's response letter made clear that it intended to place blame for Biovert's apparent failure to control mold growth on H20 and the previous mold problems at the facilities where Sea Pure was manufactured.  The problems referred to in Arch's correspondence allegedly resulted in H20 recalling products in 2007.

The specifics of KDW's prior representation of H20 are particularly pertinent here.  In June 2007, Cindy Melk, the founder and equity owner of H20 Plus, began exploring the possibility of a sale of stock in H20 Plus.  (Declaration of Timothy R. Lavender, Esq. ("Lavender Decl.") ¶ 2.)  Ms. Melk sought legal advice from Susan Greenspon, Esq., then a partner in KDW's Chicago Office. (Lavender Decl. ¶ 2; Declaration of Thomas H. Ferguson, Esq. ("Ferguson Decl.") ¶ 2.)[1]  At least fourteen KDW attorneys, including Ms. Greenspon and her Chicago-based KDW colleagues Timothy R. Lavender, Thomas H. Ferguson, and Michael R. Dover, represented H20 Plus in the transaction.  (Declaration of Joseph A. Boyle, Esq. ("Boyle Decl.") ¶ 6; Lavender Decl. ¶ 3; Ferguson Decl. ¶ 3.)  The law firm was tasked, *inter alia*, with advising H20 Plus on how to present its stock to prospective buyers.  (Lavender Decl. ¶ 4; Ferguson Decl. ¶ 4.)

5

As part of its representation, KDW managed an online, virtual "data room," which contained thousands of important, confidential H2O Plus documents.  (Declaration of Scott Oats ("Oats Decl.") ¶ 6.)  The data room contained more than 10,000 documents allegedly representing the company's most confidential and proprietary information, including contracts, regulatory information, FDA reports, H2O's standard operating procedures ("SOPs"), and other sensitive information.  (Oats Decl. ¶¶ 14-15.)  The data room was initially created by an investment banking firm, Brown Gibbons Lang & Company, but full-time management of the data room was transferred to KDW in November 2007.  (Oats Decl. ¶ 8.)  The purpose of the data room was to centralize and make easily accessible essential, confidential H2O documents that potential purchasers of H2O stock may need to review prior to entering into any purchase agreement.  (Declaration of Michael R. Dover, Esq., ("Dover Decl.") ¶ 3.)  Exactly what "managing" H2O Plus's data room entailed, and what occurred during this period of management, has become a key fact in H2O Plus's motion to disqualify KDW and is discussed in more detail in the argument section below.  However, H2O claims, among other things, that: (1) KDW was in control of the data room; (2) more than 10,000 confidential documents were reviewed by KDW in the management of the data room; (3) KDW decided what documents should be placed in the data room; (4)  the data room was accessed thousands of times; (5) the data room contained FDA related information and documents, including FDA investigators' "FDA Form 483s"; H2O's responses to these FDA Form 483s; and H2O Plus's SOPs[2]; (6) the FDA information was

---

[1] Ms. Greenspon is no longer a member of KDW.  (Lavender Decl. ¶ 2, Ferguson Decl. ¶ 2.)

[2] FDA Form 483s are essentially forms completed by the FDA upon an inspection of a facility.  (See Declaration of Paul D. Rubin, Esq. ("Rubin Decl.") ¶¶ 7-10; attached to the Supplemental Certification of Daniel F. Mulvihill, Esq. as Ex. O.)  These forms identify the agency's "observations" and concerns that result from a given inspection and/or audit.  (Id.)  An inspected company has an opportunity to respond to a FDA Form 483.  (Id.)

6

accessed by a KDW associate (Mr. Dover) who printed out hundreds of pages of FDA reports and other FDA materials; (7) Mr. Ferguson responded to diligence inquiries from the eventual buyer's counsel, Ropes & Gray, on FDA/Regulatory issues; and (8) a KDW associate, Mr. Dover, billed H20 Plus for "review[ing] data room for materials related to the FDA." (Pl's Br. 11-13; Pl.'s Reply Br. 6-7; Oats Decl. ¶¶ 10-15; Mulvihill Cert., Ex. K at H20 000034.)

In June 2008, ownership of H20 Plus was transferred from Ms. Melk to a consortium of private equity investment firms. (Pl.'s Br. 6; Mulvihill Cert., Ex. D.) The sale price was approximately $41 million; KDW's fourteen attorneys billed more than $180,000 for their services. (Oats Decl. ¶ 4.) Ms. Melk remained with H20 Plus as Chief Creative Officer. (Mulvihill Cert., Ex. D.)

5. **H20's Request that KDW withdraw from representing Arch**

On May 10, 2010, five days after Arch's response to the initial demand letter, H20 sent correspondence to KDW advising them that they had "discovered facts which show that [KDW] has a clear conflict of interest precluding its and your representation of Arch in the above captioned matter." (Mulvihill Cert., Ex. C.) At oral argument, H20 explained how shocked Mr. Bob Seidel, H20's President and Chief Executive Officer, felt at receiving the accusatory letter from KDW, H20's former attorneys. (See Transcript of Oral Argument dated November 15, 2010 ("Tr.") at 7:11-21; 47:1-8.) H20's counsel advised KDW that it had represented H20 in its sale of the company, and that, in connection with that representation, KDW was privy to and examined sensitive, confidential documents, including confidential FDA-related documents that were referred to in KDW's letter on behalf of Arch. (Id.) The confidential issues investigated during the previous representation were alleged to include:

- H2O Plus's compliance with industry standards, including but not limited to, the maintenance of proper hygiene at its plant and compliance with the FDA's audit
- the quality of the company's plant operations and manufacturing processes.
- its communications with the FDA and other federal regulatory bodies.
- its safety program and records.
- its potential actions, claims and disputes with suppliers such as Arch.

(Mulvihill Cert., Ex. C at 2.)[3]

H20 alleged that given Arch's express threat to make H20's mold recall and FDA history an issue in litigation, and given its involvement in the sale and due diligence relating to H20's records, including mold recalls and confidential FDA-related records, it was precluded from representing Arch pursuant to RPC 1.9.

**6.      KDW Rebuffs H20 Plus's Request to Withdraw as Counsel for Arch**

On May 20, 2010, KDW rejected H20 Plus's request that it withdraw stating that it "has . . . no disqualifying conflict."  (Mulvihill Cert., Ex. E.)  KDW stated that its prior representation of H20 Plus in its 2008 transaction was not "substantially related" to the current dispute.  (Id.)

## DISCUSSION

**A.      Legal Standard**

Local Civil Rule 103.1(a) establishes that the American Bar Association's Rules of Professional Conduct ("RPC") as revised by the Supreme Court of New Jersey govern the conduct of the members of the bar admitted to this Court.   See United States v. Balter, 91 F.3d 427, 435 (3d Cir. 1996), cert. denied 519 U.S. 1011 (1996); see also Wyeth v. Abbott Labs., 692 F. Supp. 2d 453,

---

[3]  In the briefing, the parties -- mainly Defendants -- refer to these five bullet points as the "Five Categories of Information."

456 (D.N.J. 2010) (stating that when interpreting the RPC Courts look mainly to New Jersey state courts' opinions and modify them only when federal law requires or permits). The party seeking disqualification must carry a heavy burden and must meet a "high standard of proof before a lawyer is disqualified." <u>Phelps v. D&S Consultants, Inc.</u>, No. 09-6386, 2010 WL 3186241, at *5 (D.N.J. Aug. 10, 2010).

The Third Circuit has noted that "[a]lthough disqualification ordinarily is the result of a finding that a disciplinary rule prohibits an attorney's appearance in a case, disqualification never is automatic." <u>United States v. Miller</u>, 624 F.2d 1198, 1201 (3d Cir. 1980).  Generally, motions to disqualify are disfavored because they "can have such drastic consequences." <u>Rohm and Haas Co. v. American Cyanamid Co.</u>, 187 F. Supp. 2d 221, 226 (D.N.J. 2001).  As a result, careful scrutiny of the facts of each case is required to prevent unjust results.  <u>See</u> <u>Montgomery Acad. v. Kohn</u>, 50 F. Supp. 2d 344, 349 (D.N.J. 1999).  Furthermore, "[r]esolution of a motion to disqualify requires the court to balance 'the need to maintain the highest standards of the [legal] profession' against 'a client's right to freely choose his counsel.'" <u>Steel v. General Motors Corp.</u>, 912 F. Supp. 724, 733 (D.N.J. 1995).

Here, H20 has moved to disqualify KDW based upon RPC 1.9(a), which provides:

> (a)      A lawyer who has represented a client in a matter shall not thereafter represent another client in the same or substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client gives informed consent confirmed in writing.

R.P.C. 1.9(a).[4]

---

[4] R.P.C. 1.10 provides that any attorney disqualification under Rule 1.9 is imputed to any firm with which the disqualified attorney is associated.  R.P.C. 1.10(a).

Rule 1.9(a) has three requirements: (1) the existence of a past attorney client relationship; (2) that the current representation involves the same or a matter substantially related to the previous representation; and (3) that the interests of the attorney's current client are materially adverse to the interests of the former client.  See, e.g., Host Marriott Corp. v. Fast Food Operators, Inc., 891 F. Supp. 1002, 1007 (D.N.J. 1995); Kaselaan & D'Angelo Assoc., Inc. v. D'Angelo, 144 F.R.D. 235, 238 (D.N.J. 1992).  The only disputed issue here is the "substantial relationship" factor (requirement (2) above).

The New Jersey Supreme Court recently issued a definitive opinion regarding the "substantial relationship" factor of Rule 1.9(a), see City of Atlantic City v. Trupos, 201 N.J. 447, 460-67 (2010). In Trupos, the New Jersey Supreme Court noted that, since the elimination of the "appearance of impropriety language from the Rules of Professional Conduct in 2004," there has been "no reported New Jersey case [that] has spoken directly on what may constitute 'substantially related matters' as set forth in RPC 1.9(a)." Id. at 464.  Thus, the Court, noting "the paucity of authoritative precedent," looked to other jurisdictions, including Pennsylvania, New York, Washington, and certain federal courts, including the New Jersey District Courts and the Seventh Circuit Court of Appeals, to craft a governing standard.  Id. at 465-66.  In so doing, the New Jersey Supreme Court settled on the following:

> For purposes of RPC 1.9, matters are deemed to be 'substantially related' if
>
> (1) the lawyer for whom disqualification is sought received confidential information from the former client that can be used against that client in the subsequent representation of parties adverse to the former client _or_ (2) facts relevant to the prior representation are both relevant and material to the subsequent representation.

Id. at 467 (emphases added).

The Court held that disqualification of counsel must be based in "fact," id. at 464, and that "surmise alone cannot support an order of disqualification." Id. at 470.

**B.    Parties' Arguments**

The parties agree that KDW had a previous attorney-client relationship with H20 and that the interests of the parties are now materially adverse.  (Pl.'s Br. 7-9; Defs.' Br. 16.)  The parties also agree that the only disputed factor is whether KDW's prior representation of H20 is "substantially related," within the meaning of Rule 1.9 and Trupos, to its representation of Arch in this case.  (Id.)

While technically moving under both subsections (1) and (2) of the Trupos substantial relationship test, H20 focuses heavily on the first prong, forcefully arguing that KDW "received" "confidential" information in the prior representation that "can be" used against H20 in this litigation.  Since KDW's response to the initial demand letter clearly signaled an intent to make H20's previous history with the mold issues and FDA compliance a central issue in this case, the parties have focused their arguments on: (1) whether FDA documents were received in the prior representation; (2) whether that information and documents are confidential; and (3) whether they can be used against H20 in this case.  If confidential information was received in the prior representation that can be used against H20 in this case, then KDW's representation of Arch would violate Rule 1.9(a).

**1.    Arch's Arguments**

Defendants argue they did not "receive" any confidential information.  (Defs.' Br. 19.)  This argument is premised on KDW's assertion that it did not "substantively review" any confidential FDA materials during the previous representation.  (Defs.' Br. 19-21.)  Defendants admit that FDA

materials were in the data room, but claim that they were not reviewed by KDW attorneys in any meaningful way and, thus, no information was received, attempting to draw parallels to the insufficient proofs supporting disqualification in <u>Trupos</u>.  (<u>Id.</u> at 19-21, 24.)  Indeed, Defendants state that KDW's work for H20 during the sale was nothing more than "transactional work," and that H20's "intellectual property counsel," DLA Piper, conducted any necessary substantive review of FDA documents and other materials identified in the Five Categories of Information.  (<u>Id.</u> at 21.)[5] Defendants support these statements with declarations from Messrs. Ferguson, Lavender and Dover, which all state that "No Kelly Drye attorney still with the firm did any substantive review of those documents, or of any documents in the remainder of the categories of documents." (Ferguson Decl. ¶ 9; Lavender Decl. ¶ 9; Dover Decl. ¶¶ 5-6.)[6]  Defendants argue that the only attorney that had any responsibility for reviewing FDA related documents was Mr. Dover, described as a "first year associate," and that he was simply responsible for "making sure that the correct documents were properly uploaded to the data room."  (Defs.' Br. at 23.)  Mr. Dover submitted a declaration stating:

> 5.   With respect to H20 Plus's documents relating to an FDA audit or communications with the FDA, I understand that H20 Plus's then intellectual property counsel, DLA Piper, conducted any substantive reviews. **I did have access to certain FDA documents and would have uploaded them in the data room, but I did not substantively review any documents relating to an FDA audit or FDA communications and do not recall the topic or nature of any documents relating to an FDA audit or FDA communication**. At most, I did only a cursory overview of the FDA-related documents in order to make sure that they were uploaded to the correct location in the data room . . . .

---

[5] No information is provided regarding any "substantive reviews" performed by DLA attorneys.

[6] It remains unclear whether or not attorneys who are no longer associated with KDW did perform substantive FDA-related reviews.

(Dover Decl. ¶ 5 (emphasis added).)

Aside from whether the documents were "received," KDW also argues they were not "confidential." (Defs.' Br. 4-6, 25.)  They state that the information relating to H20's previous FDA compliance is available by searching the FDA's website; from an open internet search (*e.g.*, a Google search); from Freedom of Information Act ("FOIA") requests sent to the FDA; and from a 2003 article in a magazine titled Entrepreneur, which discussed the FDA investigations.  (Defs.' Br. 4-5.)  In addition, they argue that any information that was placed in their response to H20's initial demand letter was "not learned or received . . . from the representation of H20 Plus."  (Id. at 4.)[7]

In the alternative, Arch attempts to argue that no information from the past representation "can be used" against H20 in the present suit because the sale of H20 was completed in 2008 and the Sea Pure line was first manufactured in April 2009.  (See, e.g., Tr. 20:5-18; 30:10-38:16.)[8]  Finally, Arch argues that even if there is a conflict, the "balancing of hardships" should favor allowing KDW to proceed in this case because KDW is their "go to" firm and has represented the companies for years in "substantive litigation matters."  (Defs.' Br. 28.)

---

[7]  At oral argument, Defendants' counsel stated that the information used in Arch's May 5, 2010 response letter was obtained from his client and that he assumed the information was "pulled off the internet."  (Tr. at 21:8-23.)

[8]  The Court notes that this argument was articulated in Defendants' brief only with respect to subsection (2) of the Trupos "substantially related" test -- *i.e.*, whether "facts relevant to the prior representation are both relevant and material to the subsequent representation."  See 201 N.J. at 465; see also Defs.' Br. 2, 26.

13

2.     **H20's Arguments**

H20 Plus first argues that it is undisputed that KDW's attorneys were in possession of FDA

related documents (including FDA Form 483s and H20's responses); electronically accessed those

documents; and billed for reviewing them.  (Pl.'s Br. 11-14.)  Whether classified as a "substantive

review" or not, something H20 contends is irrelevant under RPC 1.9, the FDA-related documents

were clearly "received" by KDW in the prior representation in that they were accessed, downloaded,

reviewed, and printed; moreover, H20 provides KDW billing records that show that H20 was *billed*

for time spent by Mr. Dover "review[ing] [the] data room for materials related to the FDA."

(Mulvihill Cert., Ex. K at H20 000034.)

In further support of its argument that KDW "received" FDA materials, H20 submits an

affidavit from Andrew J. Owen, Esq., a lawyer at Ropes & Gray, the firm that represented the private

equity purchasers in the sale of the H20 business in 2008.  Mr. Owen's declaration is characterized

as confirming the following:

> (1)  Tom Ferguson conducted diligence on behalf of H20 Plus relating to
> FDA issues;
>
> (2)  Ropes & Gray directed specific FDA-related questions about certain
> alleged deficiencies in H20 Plus's operations identified by the FDA directly
> to Mr. Ferguson; and
>
> (3) both Ropes & Gray's Supplemental Diligence Requests and KDW's
> responses to the requests contain confidential information.

(Pl's Reply Br. at 4; see also Declaration of Andrew J. Owen, Esq. ("Owen Decl."), attached to the
Supplemental Declaration of Daniel F. Mulvihill, Esq. as Exhibit M, at ¶¶ 3-7.)

H20 points to an email attached to Mr. Owen's declaration sent from a Ropes & Gray

attorney and received by Mr. Ferguson that attaches a "supplemental diligence list."  (See Owen

Decl., Ex. M-1.)  The purpose of the list was to ask questions to assist the prospective buyers conduct their due diligence, and it contains requests that follow under a heading "FDA/Regulatory" (Id.)  H20 notes that under that heading follow a series of questions relating to "Canadian Customs," "FDA inspections," and "other issues," and that these questions specifically inquire into FDA inspections in 2007, which are the same inspections referenced in Arch's response to H20's initial demand letter.  (Id.)  KDW attorney, Mr. Ferguson, sent an email that attached responses to these questions, and H20 contends that his response plainly establishes that KDW, contrary to its representations, was involved in due diligence relating to regulatory issues overall and FDA issues in particular.  (Id.)  For example, in one response, Mr. Ferguson apparently states that a Canadian Customs issue was "an immaterial item -- that was an approx. 1,500 issue and has been resolved." (Id.)  In response to FDA inspections, Mr. Ferguson states, "company to provide evidence of compliance." (Id.)  In response to "other issues," Mr. Ferguson provides details regarding two events in China.  (Id.)  Furthermore, Mr. Ferguson's email attaching these responses also refers to "diligence phone calls from yesterday."  (Id.)  In addition, H20 claims that a second email, sent by a Ropes & Gray attorney also to Mr. Ferguson, confirms KDW's involvement in regulatory and FDA due diligence.  The second email states in part:

> I have reviewed the FDA materials that the Company provided in the data room and have a few additional questions that require clarification:
>
> 1.      SOP#Q-0084-01:  Please provide an explanation of how the SOP provided in the data room addresses the observations of the FDA.  In reading the observation, it appears that this SOP remains [redacted].  For example, the FDA observation describes [redacted] testing of sanitizing agents.  However, the SOP [redacted].
>
> 2.      SOP#Q-0094-01:  Please provide an explanation of how this

15

SOP provided in the data room addresses the observation of the FDA. The observation pointed out that H20 [redacted] the SOP. According to the documents provided in the data room, it appears that [redacted] the SOP. Is H20 following the current SOP guidelines?

3.    Observation 12:  Have new process validation protocols and studies been initiated?

Please advise.

(Owen Decl., Ex. M-2.)

Additionally, H20 provides an internal H20 Plus computer printout that shows who accessed the H20 data room, when, and what was reviewed.  (See Supplemental Declaration of Scott Oats, ¶¶ 1, 4 & Ex. N-1; attached to the Supp. Mulvihill Cert. as Ex. N.)  That list shows extensive accessing of FDA documents by Mr. Dover, including downloading and printing them.  (Id. at Ex. N-1.)  Thus, H20 contends it is patently clear that KDW "received" information.

Turning to the confidentiality of the information received, H20 notes that the FDA-related documents accessed by Mr. Dover were in unredacted form.  H20 Plus submits a declaration from an FDA specialist at the Patton Boggs firm, Paul D. Rubin Esq., which states that when the FDA receives FOIA requests, it only produces Form 483s and responses to those reports in *redacted* form, removing a company's "non-public information, such as trade secret and confidential commercial information."  (Rubin Decl. ¶ 9.)  This sensitive information is removed and replaced with the marking "(b)(4)."  (Id. ¶¶ 8, 10.)  According to H20, Mr. Rubin's unrefuted certification confirms the confidentiality of these FDA documents.  Moreover, Mr. Rubin opines that it is unlikely that H20's SOPs are even in the possession of the FDA, and thus, it would be highly unlikely that they could be produced by the FDA in response to a FOIA request in *any* form.  (Id. ¶ 13.)  Thus, H20 Plus argues that KDW clearly accessed confidential, otherwise unavailable FDA documents, including the 483s

16

and H2O's SOPs, in an unredacted form.  These reports, allegedly, would be the most probative evidence of compliance and FDA related issues; constitutes H20's FDA "roadmap"; are highly sensitive and publicly unavailable in unredacted form; and would potentially "highlight[] H20 Plus's greatest potential vulnerabilities . . . ."  (Pl.'s Reply Br. at 10.)

    **3.**    <u>**Arch's Sur-Reply**</u>

Defendants sur-reply brief *does not dispute* the accuracy of any of the statements in Mr. Owen's declaration, nor does it dispute that Mr. Dover downloaded unredacted FDA related documents.  Rather, Defendants contend that Mr. Ferguson response to the FDA diligence requests states only that the "company would provide information," and that this shows that KDW did not actually conduct any substantive review of FDA documents, but rather "served merely as a passive conduit for information between the buyer, on one hand, and the seller, or its representatives, on the other hand."  (Defs.' Sur-Reply Br. 5.)

In response to Mr. Rubin's Declaration establishing the confidential nature of the unredacted FDA documents accessed by Mr. Dover, as well as the diligence responses provided by Mr. Ferguson, Defendants drastically shift their argument with respect to confidentiality.  In sur-reply, KDW first contends whether the "unredacted FDA-related documents" are publicly available or not is "of no moment" because such documents "will be produced in discovery in this litigation and therefore cannot support disqualification."   (<u>Id.</u> at 9.)

**C.**     **KDW's Representation of Arch in this Case Violates Rule 1.9**

**1.**     **KDW "received" confidential information**

The record demonstrates that it is essentially undisputed that KDW "received" information from H20 during its prior representation of the company.  The confidential information that KDW received was not limited to generally sensitive and proprietary information, but rather included FDA-related information that specifically bears upon KDW's accusations made in Arch's response to H20's initial demand letter.  Proof of the receipt of information is illustrated by the following undisputed facts:

- KDW was responsible for management of the data room;

- KDW decided what documents should be placed in the data room;

- The data room was accessed more than a thousand times;

- The data room contained sensitive FDA related information and documents;

- FDA information was accessed by a KDW associate, Mr. Dover, who printed out numerous FDA reports and responses to reports exceeding in total a few hundred pages;

- Mr. Dover billed H20 for reviewing the data room for FDA-related materials;

- KDW received diligence requests that included requests relating to FDA inspections that occurred during the same time period referenced in Arch's response to H20's initial demand letter.

(See Oats Decl. ¶¶ 13-17; Supplemental Oats Decl. ¶¶ 4-5; Mulvihill Cert., Ex. K at H20 000034; Owen Decl. ¶¶ 3-7.)

It is beyond all doubt that KDW received FDA-related information in the prior representation of H20.  Thus, KDW's attempt to analogize the facts of this case to those insufficient to support disqualification in <u>Trupos</u> falls woefully short.  (Defs.' Br. 24.)

In <u>Trupos</u>, the attorneys for whom disqualification was sought represented the City of Atlantic City in certain real estate tax appeal matters in 2006 and 2007.  <u>See</u> 201 N.J. at 451-52. During the period of representation, the municipality undertook a court-ordered, city-wide revaluation of tax assessments, and the law firm attended two meetings during which a new revaluation company was selected.  <u>Id.</u>  The firm's representation of the municipality ended in 2008; thereafter, a number of taxpayers retained the law firm to appeal assessments in 2009.  <u>See id.</u>  The tax court disqualified the firm because it *assumed* the law firm "must have had an opportunity to discuss settlement parameters and litigation strategy with the Mayor, Council and the assessor" in the prior representation.  <u>See id.</u> at 456-57.

On appeal, the New Jersey Supreme Court announced the new standard to govern disqualification under Rule 1.9 and reversed.  The Court concluded that the tax court's "surmise" that the law firm "must have had an opportunity to discuss settlement parameters" was insufficient, without *record proof*, to establish a basis for disqualification.  <u>Id.</u> at 469.  Likewise, it found that during the meetings the law firm attended, the sole issue discussed was the retention of a real estate revaluation company, and that there was no discussion of "substantive matters . . . ."  <u>Id.</u>  Moreover, the New Jersey Supreme Court concluded that the facts of the 2006 and 2007 tax appeals were sufficiently different than those underlying the 2009 appeals because different appraisers performed the appraisals and there was no proof that the facts of the prior representation were "relevant or

material" to the latter appeals.  Id.  Based on the absence of actual proof that confidential information was received, disqualification was improper.

The facts here differ dramatically from Trupos.  In their response to H20 Plus's demand letter, Defendants signaled their unambiguous intent to make H20's history with mold issues and the FDA an important issue, if not the sole issue, in this case.  And, unlike Trupos, there is unrefuted record proof that KDW received confidential FDA-related information during the course of the previous representation, including the bullet points set forth above.  Trupos was based on assumptions; this case turns on record proof.

### 2.   The Information KDW Received was and is "Confidential"

Mr. Rubin's declaration makes clear that FDA-related materials in the data room and other documents relating to standard operating procedures were accessed by KDW during the prior representation and are not available in unredacted form from any publicly accessible source. Indeed, at oral argument, Arch's counsel conceded that responses received from the FDA to any FOIA request would be redacted, thus demonstrating their confidentiality.  (See Tr. at 36:16-17.)  By accessing unredacted versions of FDA Form 483s, H20's responses to the Forms, and H20's SOPs, KDW received "confidential" information during its previous representation of H20.[9]  It is also equally clear that KDW, retained in the broad sense to conduct diligence on behalf of H20 and make

---

[9]  Defendants go to great lengths attempting to show that they did not actually rely upon confidential information in their response to H20's initial demand letter.  Contrary to KDW's argument, however, the *actual use* of confidential information received in a prior representation is irrelevant.  Trupos requires only that confidential material was received by counsel and that such material "can be," 201 N.J. at 467, or "could have been or might be," id. at 469, used against a former client.  There is no requirement in Trupos that confidential information actually be used.  See id.

the company an attractive target for potential buyers, received and responded to diligence requests sent by counsel at Ropes & Gray relating to issues that were confidential.

Despite the obvious accessing of unredacted confidential information, Defendants argue that this secret and publicly unavailable information is actually not "confidential," within the meaning of Rule 1.9 and <u>Trupos</u>, because "such documents will be produced in this litigation during discovery." (Defs.' Sur-Reply Br. at 9-10.) In support of this position, Arch relies on two district court cases where courts declined to disqualify counsel when the "confidential information" allegedly received in the prior representation was likely to be produced during discovery. See <u>Abney v. Wal-Mart</u>, 984 F. Supp. 526, 530 (E.D. Tex. 1997); <u>Medical Diagnostic Imaging, PLLC v. CareCore, Nat., LLC</u>, 542 F. Supp. 2d 296, 315 (S.D.N.Y. 2008). Relying on these highly inapposite, non-binding cases, Arch contends that in order for information to be "confidential" for purposes of Rule 1.9, it has to be *privileged* and protected from disclosure. This argument is meritless.

First, the non-binding district court cases cited do not apply the New Jersey Rules of Professional Conduct nor do they apply the <u>Trupos</u> standard, and Arch's counsel has conceded that no authority exists for such a position in the New Jersey state or federal courts. (<u>See</u> Tr. 18:7-11.)[10] Putting that aside, other courts have rejected the notion that the potential disclosure of confidential information in discovery could somehow ameliorate a conflict under Rule 1.9. <u>See, e.g.</u>, <u>Webb v. E.I. DuPont de Nemours & Co., Inc.</u>, 811 F. Supp. 158, 162 (D. Del. 1992) (applying Delaware's

---

[10] Also at oral argument, the Court noted that the <u>Trupos</u> standard clearly states confidential, not privileged, and if the <u>Trupos</u> court really intended to have the issue of disqualification turn on the the receipt of privileged information, it is reasonable to assume that the <u>Trupos</u> court would have said so. Counsel for Arch did not disagree, given the clarity with which the New Jersey Supreme

version of Rule 1.9, and noting "[i]n the case at hand there is no question that Mr. Stull was involved in a substantially related matter while working for Du Pont, since he drafted the very documents he is now offering in evidence against Du Pont. *It is immaterial that those documents would be available to any attorney in discovery. Rule 1.9(a) is not addressed to the documents but to the representation in general.* (emphasis added)).

Second, in <u>Trupos</u>, the New Jersey Supreme Court, after adopting the standard to govern the substantial relationship test, expressly referred to New Jersey Rule of Professional Conduct 1.6, and noted that the new standard would be consistent with it. <u>See</u> <u>Trupos</u>, 201 N.J. at 467.  The reference to Rule 1.6 is noteworthy because that Rule addresses basic <u>confidentiality</u> and has been interpreted broadly to encompass the full scope of an attorney-client relationship.  <u>See, e.g.</u>, <u>In re Adv. Op. No. 544 of New Jersey Supreme Court Adv. Comm. on Prof'l Ethics</u>, 103 N.J. 399, 406-07 ("this Rule [1.6] expands the scope of protected information to include all information relating to the representation, regardless of the source or whether the client has requested it be kept confidential or whether disclosure of the information would be embarrassing or detrimental to the client."); <u>Reardon v. Marlayne Sys.</u>, 83 N.J. 460, 476 (1980) ("Patton asserts that the information it is claimed he had access to as an associate with the Carpenter firm is publicly available through other channels. This defense has repeatedly been found to be without merit, as the Canons seek to protect against the unconscious, as well as conscious, use of information gained during the attorney-client relationship."), <u>superseded by rule as stated in</u> <u>Dewey v. R.J. Reynolds Tobacco Co.</u>, 109 N.J. 201 (1998).

Third, a discovery disclosure based standard governing disqualification is illogical and

---

Court announced the new standard.  (<u>See</u> Tr. 19:3-13.)

impractical.  A simple example demonstrates the difficulties with such a standard.  Say a lawyer adverse to a former client files a motion and prevails and the suit never reaches discovery.  In theory, a lawyer could have confidential information from a client and use it to craft a motion to dismiss a subsequent complaint.  If that motion were to be granted, the lawyer, operating under a conflict, would have successfully avoided disqualification only because the lawyer was particularly adept at using confidential information to his/her benefit before discovery ever commenced.  Here, the confidential information was arguably referred to in a pre-litigation letter.  (Certainly it could be used against H20 in the litigation.)  However, it is unclear whether the case will reach discovery or what the scope of discovery will be.  Tying disqualification to future discovery is simply unworkable.  It also does not comport with the policies that RPC 1.9 is premised upon.

There are many other problems.  As one court has described, having access to otherwise confidential information from a previous representation could provide advantages such as "knowing what to ask for in discovery, which witnesses to seek to depose, what questions to ask them, what lines of attack to abandon and what lines to pursue, what settlements to accept and what offers to reject, and innumerable other uses."  Webb, 811 F. Supp. at 162.  It is unfair to afford one side such an advantage.  The privilege standard alluded to by KDW is equally problematic.  A former client seeking to keep a lawyer from side-switching would essentially be required to disclose privileged communications simply to maintain a level playing field and meet its burden of persuasion on a motion to disqualify.  Every disqualification motion would have the potential to turn into a sub-dispute over complex privilege issues relating to documents and communications -- all before the

case even started.  Such a standard would be manifestly unworkable and improper.[11]

      **3.**        **<u>The Information can be or might be used against H20</u>**

At oral argument, Defendants alternatively argued that no confidential information KDW received "can be" used against H20 in this case.  Apparently, Defendants contend that any confidential information it did receive during the prior representation had to do with H20's issues dating back to 2007 or earlier, and that no proof has been submitted that KDW has any knowledge of the cleanliness of H20's facility in 2009, which is when Biovert allegedly failed.  In other words, Arch contends that, because H20 will, according to it, argue its plant is flawless, any information it may have relating to the state of the plant in 2007 is immaterial and cannot be used against H20 in this case.  However, this bewildering argument is belied by the positions Arch has taken in this case.

Arch has expressly stated that its defense to the Complaint will center on the state of H20's plant <u>well before</u> 2009 and <u>specifically</u> the prior FDA audits:

> **We understand that H20 Plus was previously subject to a voluntary recall due to mold issues that emanated from the plant or plants where its Sea Pure Products line was manufactured. Again, based on our understanding, the Food & Drug Administration ("FDA") audited the H20 Plus facility and made certain findings.  <u>It is not wild speculation to conclude that the</u>**

---

[11] H20 argues that even if a showing of privilege was required, the information provided in response to Ropes & Gray's diligence requests is in fact privileged information that would not be available in discovery.  The parties do not identify the nature of the privilege they are referring to. Nevertheless, Defendants object, arguing that the diligence requests and responses were exchanged between opposing sides of a business transaction and that no attorney-client privilege applies.  The Court need not resolve this issue because it rejects the notion that privilege must be shown in order to satisfy the <u>Trupos</u> standard.  However, it is worth noting that this Court has previously held that, under certain circumstances, communications between opposing sides of a business transaction can, in fact, be privileged.  <u>See</u> <u>La. Mun. Police Empl. Ret. Sys. v. Sealed Air</u>, 253 F.R.D. 300, 310 (D.N.J. 2008). More important, however, the mere existence of this type of dispute underscores the unworkable nature of a privileged based standard.

**problems that caused the previous voluntary recall contributed to, if not solely caused, the most recent recall of the Sea Pure Products**

(Mulvihill Cert., Ex. B.)

It is not credible for Defendants to state that the "problems that caused the previous voluntary recall contributed to, *if not solely caused*, the most recent recall of the Sea Pure Products," and to simultaneously argue that any information that KDW had access to during the prior representation would be irrelevant and could not be used against H20 in this case.  It may be true that H20 will claim that the only relevant time period is 2009.  However, *Defendants* have made, or at least attempted to make, the FDA's prior audit of H2O's facility an issue.  Having done so, and having had unique access to unredacted documents that bear on that issue, the "can be used" argument disappears.[12]

**4.     H20 Has Met Its Burden**

Based on the above, the Court concludes that H20 has established beyond all doubt that KDW should be disqualified.   KDW received and accessed confidential, publicly unavailable information during the course of the firm's prior representation of H20.  Less than two years later, KDW's response to H20's demand letter makes it patently clear that it is Arch's intention to make H20's previous FDA-related issues -- the same issues laid out in confidential documents KDW accessed during its representation of H20 -- the focal point of its defense in this case.   KDW's

---

[12] To avoid any confusion as this case proceeds, the Court is not deciding whether or not the state of the plant prior 2009 is relevant.  The Court simply concludes that Defendants have argued it is relevant and, having so argued, cannot claim that their access to confidential information bearing on that time frame cannot be used in this case.

representation of Arch in this case would violate RPCs 1.9 and 1.10(a).[13]

**D.      KDW's Balancing of Hardships Argument**

In an alternative argument, KDW contends that even if the Court finds there is a conflict, KDW should be permitted to continue the representation because it is Arch's long time "go to counsel." (Defs.' Br. 28.) This argument is dubious. There is "no right to demand to be represented by an attorney disqualified because of an ethical requirement." Trupos, 201 N.J. at 462. It is only an extraordinary case where a conflicted attorney or firm can avoid disqualification. See In re Cendant Corp. Sec. Litig., 124 F. Supp. 2d 235, 249 (D.N.J. 2000) ("Notwithstanding that the court weighs the competing interests at stake, the weight of authority suggests that where an ethical violation is found under either Rule 1.7 or 1.9 disqualification can be avoided only in extraordinary cases." (quotation omitted)).  This case presents no extraordinary circumstances.  The case has just begun; there has been no initial conference, and discovery has not commenced.  The harm to H20 should KDW be permitted to continue its representation of Arch outweighs any inconvenience to Arch resulting from its retention of new counsel at this early stage of the proceedings.

---

[13] As the Court has concluded that disqualification is proper under the first prong of the substantial relationship test, there is no need to decide whether the alternative means of establishing a

26

## <u>CONCLUSION</u>

For the above stated reasons, Plaintiff's motion to disqualify KDW [CM/ECF No. 10] is **granted**. Defendants shall have replacement counsel enter an appearance on or before December 20, 2010. An Order implementing this Opinion will be entered.

  s/Mark Falk_____
**MARK FALK**
**United States Magistrate Judge**

Dated:  November 23, 2010

---

"substantial relationship" -- i.e, subsection (b) of the <u>Trupos</u> standard -- has been satisfied.